**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

ROGER ROBERTSON,                    1:14-cv-0924-AWI-MJS-HC

               Petitioner,        **ORDER DENYING PETITION FOR**
                                                 **WRIT OF HABEAS CORPUS AND**
            v.                             **DECLINING TO ISSUE**
                                                 **CERTIFICATE OF APPEALABILITY**
**JEFFREY BEARD, Warden**,

               Respondent.
_____/        (Docs. 1, 15)

     Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, Petitioner's petition for writ of habeas corpus will be denied and the Court will decline to issue a certificate of appealability.

## I.    PROCEDURAL BACKGROUND

     Petitioner is in the custody of the California Department of Corrections pursuant to the September 9, 2010, judgment of the Superior Court of California, Mariposa County. Clerk's Tr. at 649.  Petitioner was charged in a five-count criminal information. A jury convicted Petitioner of kidnapping with intent to commit rape (count 1), in violation of California Penal Code section 209(b)(1); sexual penetration by foreign object (count 2), in violation of California Penal Code section 289(a)(1); and forcible rape (count 3), in violation of California Penal Code section 261(a)(2). Id.; Clerk's Tr. at 582-583. The jury also found true special finding number 2, attached to counts 2 and 3—that petitioner "kidnapped the victim … in violation of Penal Code

Section 207 or 209, pursuant to Penal Code Section 667.61(e)(1)." Clerk's Tr. at 582-583. Petitioner was found not guilty of an additional count of forcible rape against the same victim (count 4); or dissuading a witness (count 5), in violation of California Penal Code section 261(a)(2). Id. The jury also found not true special finding number 1, also attached to counts 2 and 3—that Petitioner's kidnapping of the victim substantially increased to risk of harm to her. Id.  Petitioner was sentenced to consecutive terms of 15 years to life on counts two and three. Clerk's Tr. at 649.  At the prosecution's request, the superior court imposed a no-contact order, restraining Petitioner from having any contact with the victim. People v. Robertson, 208 Cal.App.4th 965, 995 (Cal. Ct. App. Aug. 21, 2012).

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District, challenging the sufficiency of the evidence to support aggravated kidnapping, the admission of evidence of uncharged misconduct, and the imposition of the no-contact order. Lodged Doc. 33. On August 21, 2012 the appellate court struck the trial court's no-contact order, and in all other respects affirmed the judgment. People v. Robertson, 208 Cal.App.4th at 997. Petitioner petitioned for review to the California Supreme Court. Lodged Doc. 38. Review was denied. Lodged Doc. 39.

Petitioner has filed a total of 11 different state habeas petitions. Each appears to have been largely substantively identical to the others and to the petition now pending before this Court. The following is a chronology of Petitioner's state habeas filings and the outcomes of those petitions:

1.  On August 30, 2013, Petitioner filed a habeas petition directly with the California Supreme Court. Lodged Doc. 40. In that petition, Petitioner indicated that no issues were raised that were not contained in his direct appeal. Lodged Doc. 40.The California Supreme Court denied that petition, citing In re Waltreus, 62 Cal.2d 218, 225 (1965), for the proposition that a habeas petitioner cannot relitigate matters decided on direct appeal. Lodged Doc. 41.

2. On March 12, 2014, Petitioner filed a habeas petition with the California Fifth District Court of Appeal. Lodged Doc. 42. That petition was denied because Petitioner had not first exhausted his superior court habeas remedies. Lodged Doc. 43.

3. On May 2, 2014, Petitioner filed a second habeas petition with the California Supreme Court. Lodged Doc. 44. The California Supreme Court denied that petition, again citing In re Waltreus. Lodged Doc. 45.

4. On May 13, Petitioner filed a second habeas petition with the California Fifth District Court of Appeal. Lodged Doc. 46. Again, the Fifth District Court of Appeal denied that petition for failure to exhaust superior court habeas remedies. Lodged Doc. 47.

5. On June 24, 2014, Petitioner filed a habeas petition with the Mariposa County Superior Court.  Lodged Doc. 48.  The Mariposa County Superior Court denied that petition as "unintelligible." Lodged Doc. 49.

6. On June 25, 2014, Petitioner filed a second habeas petition with the Mariposa County Superior Court. Lodged Doc. 50. The Mariposa County Superior Court denied that petition as "unintelligible." Lodged Doc. 51

7. On July 15, 2014, Petitioner filed a third habeas petition with the Mariposa County Superior Court. Lodged Doc. 52. The Mariposa County Superior Court denied that petition as redundant of Petitioner's other filings. Lodged Doc. 53.

8. On July 24, 2014, Petitioner filed a third habeas petition with the California Supreme Court. Lodged Doc. 54. The California Supreme Court denied that petition citing In re Clark, 5 Cal.4th 750, 767-769 (1993), for the proposition that a court may refuse to consider repeated or piecemeal applications for habeas corpus.[1]

---

[1] California Supreme Court, Case No. S220058, docket, located at: http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=2082888&doc_no=S220058, last accessed July 6, 2016.

9.  On July 28, 2014, Petitioner filed a fourth habeas petition with the California Supreme Court. Lodged Doc. 55. The California Supreme Court denied that petition, again citing In re Clark.[2]

10. On July 29, 2014, Petitioner filed a third habeas petition with the California Fifth District Court of Appeal. Lodged Doc. 56. The California Fifth District Court of Appeal denied that petition, noting that Petitioner failed to show that he exhausted superior court habeas remedies and that Petitioner's petition is conclusory, successive, and contained issues that were more appropriately addressed on direct appeal.[3]

11. Finally, on September 29, 2014, Petitioner filed a fourth habeas petition with the Mariposa County Superior Court. Lodged Doc. 57. The Court's docket does not reflect the outcome of that case.

Petitioner filed his federal habeas petition on May 29, 2014. Doc. 1. He filed an amended petition on July 9, 2014.  Doc. 15.  On October 15, 2014, Respondent filed an answer to the petition.  Doc. 35.  On October 31, 2014, without leave from the Court, Petitioner a second amended petition.  Doc. 43. Each of the petitions that Petitioner filed with this Court was substantively identical.

## II.    STATEMENT OF THE FACTS[4]

### I. Prosecution Evidence.

In fall of 2009, appellant and his wife lived on a parcel of land containing a house, a detached garage, a workshop, a patio and dining area, a kennel, an aviary and several small outbuildings (the compound). Appellant conducted Christian services inside the garage, which was outfitted with several rows of pews, a pulpit and a large rectangular wooden tub which resembled a coffin. This tub was lined

---

[2] California Supreme Court, Case No. S220229, docket, located at: http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=2083527&doc_no=S220229, last accessed July 6, 2016.

[3] California Fifth District Court of Appeal Case No. F070012, docket, located at: http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=5&doc_id=2086842&doc_no=F070012, last accessed July 6, 2016.

[4] The Fifth District Court of Appeal's summary of the facts in its August 21, 2012 opinion, as modified on September 7, 2012, is presumed correct. 28 U.S.C. § 2254(e)(1).

with black plastic and filled with water. It had a removable cover, which a photographic exhibit depicted as resting against an interior wall.

**A. The victim's testimony.**

The victim is a native of Mexico who cannot speak English. She has four children, including a daughter who suffers from diabetes and an adult son named Miguel.

The victim attended three services conducted by appellant because several people told her that "[h]e worked miracles so I went there to have my daughter healed." Appellant told the victim "that he could heal [her] daughter" and asked the victim to bring the girl to see him. They made arrangements for appellant to meet her daughter sometime in October.

Appellant told the victim "that God told him" that her son should baptize her. So, during the victim's second visit to the compound, appellant directed the victim's minor son in baptizing the victim in the tub. During this baptism, the victim was fully submerged in the tub. The victim participated because she "wanted to have him heal [her] daughter."

The victim believed appellant was endowed by God with special healing powers that enabled him to work miracles. During the victim's baptism, appellant pulled out a towel that he said was covered in the blood of Christ. She heard appellant claim to have turned a snake into a lizard.

The victim also believed appellant had the power to have someone harmed if he wanted to do so. Appellant told the victim that he had friends who were police officers in Atwater and they would hurt or kill any person he wished to be harmed. Appellant told the victim that his dogs would tear someone apart if he commanded them to do so.

During the morning of October 12, appellant called the victim. The victim could not understand appellant but thought that he was asking her to clean his home or the garage. She handed the phone to Miguel. After speaking with appellant, Miguel asked the victim if she was willing to go to the compound and clean. The victim agreed.

About half an hour later, she and Miguel drove to the compound. Appellant was waiting for them in the parking area. He told Miguel to go look for a job. When Miguel told appellant that he did not have a car, appellant told him to take his mother's truck. Miguel responded that he did not have a driver's license. Appellant gave him a vacuum and told him to clean the cabins. When appellant was alone with the victim, he said, "Why did you bring your son? I did not want your son. I wanted you alone." The victim was uncomfortable with appellant's demeanor, which she characterized as "aggressive."

Appellant walked toward the garage and told the victim to follow him. Appellant did not take any cleaning materials with him. Appellant used a key to unlock the

door at the back of the garage. He ordered her to go inside. The victim was afraid because the lights were off and the inside of the building was dark, but she obeyed him. Appellant followed her into the garage and locked the door with a key. Then he hugged her from behind. She pushed him away and tried to get to the door. The victim told appellant that she wanted to talk to his wife. He mockingly replied in Spanish that his wife was not here. He told the victim to walk toward the front of the garage where the pulpit and tub were located. When the victim refused, appellant put his arms on her back and pushed her forward past two rows of pews "[t]oward where the [tub] is." Appellant was "upset, furious." Again, he ordered her to walk forward. The victim obeyed because she "was afraid." The victim repeatedly asked appellant where his wife was and he replied in Spanish that she "is not here."

They stopped at the front of the garage near the tub. Appellant told the victim to take off her clothes and to lie on the ground. The victim initially refused but eventually lay down on the ground and took off her pants. Appellant lowered his pants. He held the victim with one hand, lifted the other hand in the air and, "in a mocking way," prayed, "Thank you Jesus for giving me a pretty woman. What I was asking you for, the prettiest woman." Appellant kissed the victim's mouth and neck. He slightly penetrated the victim's vagina with his penis at least two times. He was not able to maintain an erection so he inserted his fingers deep into her vagina.

The victim was frightened and angry but did not scream or struggle for several reasons. Appellant sexually assaulted her near the tub, which was uncovered and filled with water. The victim was afraid that if she resisted, appellant would throw her in the tub and drown her. Also, the victim was afraid that if Miguel heard her scream and came inside the garage, appellant would hurt Miguel or Miguel would hurt appellant. Finally, the victim was afraid of appellant's dogs and thought they would hurt her.

After 10 or 15 minutes, appellant and the victim heard Miguel approaching with the vacuum cleaner. Appellant pulled up his pants and the victim put her pants on. They exited the garage through the back door. Appellant told the victim to walk into the house and go to his wife's bedroom. The victim complied because she was afraid. Once they both were inside the bedroom, appellant told her to lie on the bed. She refused. Just then, Miguel opened the sliding door into the house. Appellant left the bedroom and the victim followed.

When the victim saw Miguel she did not tell him what appellant had done to her because she was worried that Miguel would try to hurt appellant. Instead, she told Miguel to tell appellant that they had to leave. He asked her what he should tell appellant and she told him to tell appellant that they had to pick up her other son from school. In order to prevent Miguel from suspecting what appellant had done to her, the victim told Miguel to ask appellant to give her a broom to sweep outside. The victim went to her truck and waited for Miguel. Appellant gave Miguel some packaged food that had passed its expiration date to take with them. Appellant went to the parking lot and prayed for them before they left.

6

Appellant repeatedly called the victim later that day and on October 13. During these calls, he told her not to tell anyone what he had done. If the victim did not answer the house's landline, appellant would call her cell phone. If she did not answer the cell phone, within seconds he would call the landline. The victim was upset by these calls and stopped answering the phone.

About a week after the sexual assault, the victim met with some of appellant's friends at a Starbucks coffee shop. She told them "what the [appellant] had done to [her]." They did not believe her, even after she swore on a Bible.

**B. Other prosecution evidence.**

On October 13, the victim and her friend Sonia Gutierrez went to the Merced Police Department to file a police report. The victim was referred to the Mariposa County Sheriff's Office, where she filed a report on October 14. Gutierrez acted as the victim's interpreter during the conversation with a police officer on October 14. Gutierrez testified that she tried to relay the information accurately but may have made some misstatements. The victim also spoke with a police officer on January 26, 2010; a certified interpreter and victim advocate were present during that interview.

A police officer who spoke with the victim on October 13 testified that when he "initially made contact with her she appeared nervous, embarrassed, and ... [y]ou could tell by her demeanor she was really embarrassed and ... was a victim of something that did occur."

The victim made some pretext phone calls to appellant in the presence of a police officer. [N.3] During the first call, appellant exhorted her "don't tell nobody, Amen." During another call, the victim told appellant that she was not happy and said that Jesus did not like him. Appellant replied, "Yeah, he forgive," and, "I told Jesus sorry, he say forgive." The victim asked appellant to confirm that he would not touch her anymore. Appellant replied, "Okay. Finished." During another call, appellant said, "Yeah. So, nobody know amen," and "Yeah, don't tell nobody, Amen."

> [N.3.] The pretext phone calls were recorded on audio CDs, which were played for the jury and admitted into evidence. A written transcript of the phone calls was provided to the jury for their reference during trial; it was stipulated that the transcript was an accurate translation of the audio recording.

T.N. testified about an incident that occurred in 1974 during which appellant kidnapped and raped her. Appellant was arrested and charged with kidnapping, rape and attempted oral copulation in connection with that sexual assault. He accepted a negotiated plea agreement and pled no contest to one count of battery.

**II. Defense Evidence.**

7

**A. Appellant's testimony.**

Appellant testified that he began Christian ministry work in 1975. Some people think that he is a "kind of a miracle worker" who "can heal their children." But he "can't. Only God can." He knows that some women are sexually attracted "to preachers because they are preachers."

Appellant said his wife was away from the compound during the morning of October 12 and he expected his daughter and her children to visit him. While he was waiting, appellant called Miguel to ask why he had not attended the service that appellant conducted on Sunday and to see if Miguel was still planning to go to "a recovery home." Miguel "translated to his mother something." Then Miguel "asked ... if my wife was there" and appellant "said no." Miguel asked appellant what he "was going to be doing," and appellant "said, what are you doing?" Miguel said they were "going to go to a work furlough place in Merced," and then said, "we're going to come and clean." Appellant replied, "I don't need you to come cleaning. Go get a job," and "hung the phone up."

About an hour later, Miguel and the victim arrived at the compound. Appellant was in his workshop when they approached him. The victim hugged appellant in an "inappropriate" way. Miguel asked appellant if he could vacuum the outbuildings and the victim asked if she could clean the garage. Appellant allowed them to stay and clean because "[p]eople come there all of the time. We eat. They clean. I don't stop them. That is their choice" to volunteer at the compound.

Appellant walked to the garage and the victim followed him. He entered the building through the back door, which was not locked. The victim followed him inside and shut the door. It was not dark inside the building because daylight entered through three windows. Nonetheless, appellant turned to switch on the lights. Suddenly, the victim grabbed appellant's penis over his pants. Appellant told her to stop, but she grabbed his penis again. Appellant removed the victim's hand and asked her to pray with him. He walked forward toward the front of the garage "to have her sit down and pray." The tub was at the front of the building; it was empty. The victim followed appellant and grabbed his crotch again. Appellant knew it "wasn't an accident" "[b]ecause this time she held on." He removed her hand. Appellant told her to "sit down there and pray and stop it." Appellant sat down on a pew and prayed to God for help. Then appellant "went to the other side to the front door," and opened the door. He turned around and saw that the victim was removing her clothing. Appellant left the garage. The victim chased him, grabbed his arm and held onto it.

Appellant saw Miguel and told him to take the victim home. Miguel replied that they came to work. Then Miguel said, "[s]he wants a broom to sweep out front." Appellant got a broom from the kitchen area, gave it to Miguel and went to his workshop. About five or 10 minutes later, the victim and Miguel approached appellant. Miguel told him that they were leaving. Appellant "prayed with them

8

and [the victim] wanted to hug me again, and I told her not to come back." Miguel took some chips and food and then he and the victim drove away.

Appellant called Miguel later that day and left a message. The victim called appellant numerous times during the next few days and he returned her phone calls. During the pretext phone calls he was merely explaining the Bible to the victim.

Appellant denied sexually assaulting T.N. He pled no contest to battery on the advice of counsel and because he "was afraid." Appellant admitted having suffered a prior drug-related conviction as well as probation and parole violations. Appellant testified that he was delivered by God from drug addiction prior to serving a term at the California Rehabilitation Center.

**B. Other defense evidence.**

Darlene Lussier testified that she attended services at the compound and was meditating there during the morning of October 12. She observed a young Hispanic man and a Hispanic woman arrive in a vehicle. Appellant gave the man a vacuum. Later, she saw appellant and the woman coming from the garage. The woman had her arm on appellant's arm. Then Lussier saw the woman holding a broom. The woman conversed with the young man; they were laughing. Then she saw appellant praying with them. The woman gave appellant a hug and he backed away. Appellant gave them some food.

Appellant's daughter, Michelle Robertson, testified that appellant expected her and her children to visit on October 12. She had car trouble and did not visit as planned.
Robertson and Gonzalo Perez testified that appellant's dogs are not mean. Robertson characterized the dogs as "[p]retty loving," and said that her children "play with them all of the time." Sandra Alvarez testified that appellant's dogs "were mean, but he had them enclosed or locked up." Appellant told Alvarez to stay away from the dogs because one of them could not see.

Alvarez testified that she was present during the conversation with the victim at the Starbucks coffee shop. The victim said that she walked into the garage to clean when appellant followed her inside and closed the door. The victim said appellant "began to remove her clothing," and then he "began to touch her body parts, and ... suck on her," and "lick[ ] her throughout her body." [N.4]

[N.4] The victim did not recall making these statements.

*People v. Robertson*, 208 Cal. App. 4th 965, 970-77 (2012), *as modified* (Sept. 7, 2012).

///

///

///

9

### III.     GOVERNING LAW

**A.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Read liberally, petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Mariposa County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a).  Accordingly, the Court has jurisdiction over the action.

**B.  Legal Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000).  Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

1.  Contrary To or An Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision, "yet reaches a different result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06.  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner."  <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand" that the Supreme Court have established "more than a 'principle' or 'general standard' …before habeas relief can be granted." <u>Musladin v. Lamarque</u>, 555 F.3d 830, 839 (9th Cir. 2009).  Governing legal principles set forth by the Supreme Court at the time a state court renders its decision constitute "clearly established Federal law." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003).

A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Lockyer</u>, 538 U.S. at 75-76 (quoting, <u>inter alia</u>, <u>Williams</u>, 529 U.S. at 409-10). A federal court's "disagreement" with a state court decision or even a "'firm conviction' that the state court [decision] was 'erroneous'" is inadequate to find that the state court decision resulted in an unreasonable application of federal law. In <u>Harrington</u>, the Court further stressed that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  <u>Id.</u> (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations."  <u>Id.</u>; <u>Renico v. Lett</u>, 559 U.S. 766, 776 (2010).  "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009), quoted by <u>Richter</u>, 559 U.S. at 101.

2.   <u>Review of State Decisions</u>

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning" at all.  <u>Richter</u>, 559 U.S. at 100.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Id.</u> at 98. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

<u>Richter</u> instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 102.  Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u>  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Id.</u> at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at 787.  It

1  follows from this consideration that § 2254(d) "complements the exhaustion requirement and the

2  doctrine of procedural bar to ensure that state proceedings are the central process, not just a

3  preliminary step for later federal habeas proceedings."  Id. (citing Wainwright v. Sykes, 433 U.S.

4  72, 90 (1977)).

5  ### IV.   REVIEW OF PETITION

6      As a preliminary matter, Petitioner has submitted three different petitions. Docs. 1, 15, 43. A

7  petition for writ of habeas corpus "may be amended or supplemented as provided in the rules of

8  procedure applicable to civil actions." 28 U.S.C. § 2242; see Rule 12 of the Rules Governing

9  § 2254 Cases. Petitioner was permitted to amend his complaint once "as a matter of course" and

10  without leave of the court, before an answer had been filed. Fed.R.Civ.P. 15(a)(1).  Petitioner did

11  so. After filing of his first amended petition, Petitioner was required to seek leave from the Court

12  to file any additional petition. Fed.R.Civ.P. 15(a)(2). Petitioner filed a second amended petition

13  without leave of the Court. When justice requires, a district court should freely grant leave to

14  amend. See Arizona Students' Association v. Arizona Board of Regents, --- F.3d ----, 2016 WL

15  3082698, *8 (9th Cir. 2016). Each of the petitions is largely identical. Leave to amend is not

16  necessary to do justice. This matter will proceed in consideration of Petitioner's first amended

17  petition for writ of habeas corpus. See Doc. 15.

18      Next, Petitioner does not clearly outline the grounds for relief. Based on the items listed as

19  grounds for relief in Petitioner's original petition before this Court, the attorney general has

20  characterized the petition as containing the following claims: (1) that the trial court erred in

21  admitting evidence of a prior uncharged sexual assault; (2) that a prospective juror poisoned the

22  jury panel; and (3) that defense counsel was ineffective.[5] That characterization is more than fair

23  to Petitioner. The Court will address the petition using that framework.

24  ///

25  ///

26

27  [5] Petitioner identified as his fourth ground for relief that "Mariposa County Court has totally gone – not there call."
Doc. 1 at 5. The attorney general addressed that ground for relief; this Court will not. This Court is unable to

28  decipher any meaning from or identify any constitutional right that might be implicated by Petitioner's fourth
ground for relief.

**A.  Claim One – The Admission of Evidence of Uncharged Misconduct**

Petitioner contends that "[i]n 2010 Mariposa Court filed false charges and a 35 year-old case to win." Doc. 1 at 4; <u>see</u> Doc. 15 at 3. Read in context, it is clear that Petitioner attributes error to the trial court's admission of evidence of sexual misconduct. This argument was raised on direct appeal: Petitioner presented and the California Fifth District Court of Appeal rejected the argument that admission evidence of Petitioner's uncharged sexual misconduct, taking place in 1974, violated the Fifth, Sixth, and Fourteenth Amendments. <u>People v. Robertson</u>, 208 Cal.App.4th at 992-995. That determination was left undisturbed by the California Supreme Court.

No clearly established federal law, as determined by the Supreme Court, holds that the Constitution requires exclusion of evidence. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). More specifically, the Ninth Circuit has recognized that "no Supreme Court precedent establish[es] that admission of propensity evidence, ash here, to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional." *Mejia v. Garcia*, 534 F.3d 1036, 1049 (9th Cir. 2008); <u>see</u> <u>Nogales v. McDonald</u>, 624 Fed.Appx. 608, 609 (9th Cir. 2015) ("[N]o clearly established Supreme Court precedent has held that admission of propensity evidence violates the Constitution.") As a result, the state court's decision to admit evidence of Petitioner's prior uncharged sexual assault was neither contrary to, nor an objectively unreasonable application of clearly established federal law. This Court will not disturb that state court determination.

**B. Claim Two – The Prospective Juror Poisoning and the Sleeping Juror**

Petitioner contends that a prospective juror made comments that poisoned the jury. Specifically, he alleges that a juror twice said "burn this mother fk—er," and mentioned that he or she could not trust pastors, apparently referring to Petitioner. Doc. 15 at 2; Doc. 1 at 4. Additionally, Petitioner notes that a seated juror fell asleep during the trial. Doc. 1 at 4. Based on those incidents—all reflected on the face of the record—Petitioner now seeks relief.

*1. Failure to Exhaust State Court Remedies*

14

A petitioner who is in state custody and wishes to collaterally challenge his confinement by a petition for writ of habeas corpus must first exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is designed to afford the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996). Additionally, the petitioner must have specifically told the state court that he was raising a federal constitutional claim. Duncan, 513 U.S. at 365-66. A petitioner "must make the federal basis of the claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is "self-evident." Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir. 2000), as amended, 247 F.3d 904 (9th Cir. 2001). If a petitioner fails to do so, "his federal claim is unexhausted regardless of its similarity to the issues raised in state court." Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996).

When a petitioner in state custody fails to exhaust his administrative remedies, the district court must dismiss his claim without prejudice. See 28 U.S.C. 2254(b)(1).

Petitioner did not raise this claim on direct appeal. See Lodged Doc. 33. Each of Petitioner's eleven habeas petitions alleged the factual basis for this claim. See Lodged Docs. 40 at 4, 42 at 5, 44 at 3, 46 at 5, 48 at 4, 50 at 3-4, 52 at 4, 54 at 3, 55 at 4, 56 at 4, 57 at 5. In none of those instances did Petitioner give any indication that he sought to raise a federal constitutional claim. As a result, Petitioner has failed to adequately exhaust this claim. This claim will be dismissed.

### 2. Procedural Default

The Supreme Court has cautioned that "federal habeas is a guard against extreme malfunctions in the ... criminal justice systems, not a substitute for ordinary error correction through appeal." Ryan v. Gonzales, ‒‒ U.S. ‒‒, 133 S.Ct. 696, 708 (2013); see Sanders v. United States, 373 U.S. 1, 25 (1963) ("[T]he [Supreme] Court has consistently held that … habeas corpus … is [not] a substitute for an appeal.") (citing, inter alia, Sunal v. Large, 332 U.S.

174 (1947)); Hibbler v. Benedetti, 693 F.3d 1140, 1148 (9th Cir. 2012) (citing Harrington v. Richter, 562 U.S. 86, 102-103 (2011)) (same); *United States v. Braswell,* 501 F.3d 1147, 1150 (9th Cir.2007) ("[B]oth for federal and state convictions, habeas review is not to substitute for an appeal.") (citing Bousley v. United States, 523 U.S. 614, 621 (1998)).

Accordingly, a criminal defendant who could have raised a claim on direct appeal by fails to do so will be found to have procedurally defaulted that claim, and may raise that claim on collateral review "only if the defendant can … demonstrate 'cause' [excusing his procedural default] and actual 'prejudice' [resulting from the claim of error] or that he is 'actually innocent.'" Braswell, 501 F.3d at 1149–50 (citing, inter alia, Bousley, 523 U.S. at 622).

The only evidence submitted in support of this claim is a selection of pages from the Reporters' Transcript. Doc. 15 at 19-21. Yet, Petitioner failed to raise this issue on direct appeal. See Lodged Doc. 33. Because Petitioner cannot show actual prejudice, as discussed in Section IV(B)(3), infra, and has not attempted to demonstrate cause for the default or actual innocence, Petitioner's claim is procedurally defaulted.

*3. Basis for Relief*

The Sixth Amendment affords an accused with the right to trial by an impartial jury. Alleyne v. United States, --- U.S. ----, 133 S.Ct. 2151, 2156 (2013); Skilling v. United States, 561 U.S. 358, 377-378 (2010). More generally, the due process clause of the Fifth Amendment guarantees a fair trial. United States v. Agurs, 427 U.S. 97, 107 (1976); see United States v. Gaudin, 515 U.S. 506, 509-510 (1995).

As to the allegation that a juror fell asleep during the proceedings, due process requires "a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982). However, no clearly established Supreme Court case law specifically addresses whether a jury sleeping during trial constitutes a Fifth or Sixth Amendment violation. See McClain v. Montgomery, 2016 WL 2586321, *16 (C.D. Cal. Apr. 11, 2016) (citing Knight v. McDonald, 2013 WL 4479298, *24 (C.D. Cal. Aug. 16, 2013). Where a state trial court has addressed the issue of a juror's inattention and found that the inattention was insubstantial, the Ninth Circuit has required the district court to defer to that determination. Anderson v. Terhune,

16

409 F. App'x 175, 179 (9th Cir. 2011) (quoting <u>United States v. Barrett</u>, 703 F.2d 1076, 1083 n.

13 (9th Cir.1983)). No due process violation is cognizable in this context, unless a petitioner

demonstrates to the state court that a juror's inattention deprived him of due process by, for

instance, sleeping through a critical portion of the trial. <u>See</u> <u>United States v. Springfield</u>, 829

F.3d 860, 864 (9th Cir. 1987); <u>Anderson v. Terhune</u>, 409 F. App'x at 179.

 The trial court judge addressed the issue. The relevant portion of the record reads as follows:

> The Court: … The reason why I interrupted is because we have a juror falling [asleep]…. So, Fred, [(the bailiff)]… [y]ou need to get her some coffee, now.
>
> The Bailiff: Okay.
>
> Ms. Fletcher: For the record, if there is an issue that we may need to bring in a substitute.
>
> The Court: Right. She didn't close her eyes, but –
>
> Ms. Fletcher: She's kind of struggling.
>
> The Court: Yeah, just starring off to the distance. Everyone else seems to be awake. It's only been for the last five minutes. She appears tired.
>
> [The juror was called to the courtroom.]
>
> The Court: … I noticed during argument for a period of time, don't be upset or nervous, but it's quite obvious that you are tired.
>
> Juror Number 7: Yeah.
>
> The Court: And you seem to be heavy eyes and maybe not fully focused. Have you heard everything today?
>
> Juror Number 7: Oh, yeah. I've heard everything….
>
> The Court: So you have had a cigarette. That help pump you up a little?
>
> Juror Number 7: A little. I'm drinking some coffee.
>
> The Court: Can you assure me that you will be able to complete this?
>
> Juror Number 7: I'll be fine. Especially now standing here in front of everyone…. [¶¶] I want you to know though I have been listening in and is nothing I have missed.
>
> The Court: Thank you… I'm convinced she has been listening, but I felt it was something we had to deal with….

Reporter's Transcript on Appeal at 3555-3557; Lodged Doc.28. Even if the state court had been

presented with the issue as a violation of federal law, a determination that the issue presented did

not violate the Fifth or Sixth amendments would not have been contrary to, or an objectively

unreasonable application of clearly established federal law. Petitioner has presented no basis for

relief on this claim; Petitioner's claim fails on its merits.

Next, the Court looks to the claim that the prospective juror poisoned the panel.

First, petitioner has not identified any Supreme Court precedent that the Constitution requires

trial courts to admonish a jury panel (or otherwise correct a statement tending to show bias)

whenever a prospective juror who was excused before trial made potentially damaging

statements to other jurors. Where, like here, the Supreme Court has not "squarely established" a

legal rule that governs a particular claim, it cannot be said that a state court's decision

unreasonably applied federal law when it adjudicated that claim. See Knowles v. Mirzayance,

556 U.S. 111, 122 (2009) (holding that "it is not 'an unreasonable application of clearly

established Federal law' for a state court to decline to apply a specific legal rule that has not been

squarely established by this Court"); Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per

curiam) (denying habeas relief where Supreme Court cases provided "no clear answer to the

question presented") (citations omitted); Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the

lack of holdings from this Court regarding" the claim, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.' " (alterations in original)). On that

basis, Petitioner's claim is appropriately denied.

Insofar as Petitioner contends that the prospective juror's own bias impacted the proceedings,

as noted, the Sixth Amendment affords the right to a fair and impartial jury. The "[Supreme]

Court has long held that the remedy for allegations of juror partiality is a hearing in which the

defendant has the opportunity to prove actual bias. Smith v. Phillips, 455 U.S. 209, 215 (1982)

(citing Remmer v. United States, 347 U.S. 227 (1954)).  Whether a prospective juror was biased

or infected the proceedings with bias "is a 'factual issue.'" Wainwright v. Witt, 469 U.S. 412,

426-427 (1985). Where the state court has made a determination on that issue, a reviewing

federal court must afford the state court determination a "presumption of correctness."

Wainwright, 469 U.S. at 427; see 28 U.S.C. §2254(e)(1).

In this instance, Petitioner's wife overheard a potential juror make comments regarding

Petitioner's status as a pastor and a statement to the effect that someone should "burn the mother

F-er," presumably referring to Petitioner. Reporter's Transcript at 656. Upon receiving that report the trial court conducted a hearing to determine what, if anything, the prospective juror in question said and which other potential jurors may have overheard. Reporter's Transcript at 647-666. The trial court determined that a prospective juror likely made the comments to a second prospective juror and that a third prospective juror may have overheard. Id. The trial court excused the first prospective juror for cause. Reporter's Transcript at 664-665. The trial court privately conducted a *voir dire* of the second prospective juror. As to the first prospective juror's statement, the second potential juror indicated: "It doesn't effect me in any way, no, no." Reporter's Transcript at 663. The trial court determined the second prospective juror "was honest" and "did the right thing"; the court found that the second prospective juror "ha[d] not been tainted." Reporter's Transcript at 665. The identity of the third prospective juror does not appear to have been discovered.

Although Petitioner did not raise this issue as a federal constitutional issue to the state court, if he had and the state court had rejected that argument, a determination that the issue presented did not violate the Fifth or Sixth amendments would not have been contrary to, or an objectively unreasonable application of clearly established federal law. Petitioner has presented no basis for relief on this claim; Petitioner's claim fails.

**C. Claim Three – Ineffective Assistance of Counsel**

In Petitioner's third claim for relief, he contends that trial counsel "[(1)] came to court late, [(2)] forgot [Petitioner's] name," Doc. 15 at 4, [(3)] promised that Petitioner would not be convicted, [(4)] failed to adequately investigate, Doc. 1 at 5, [(5)] smelled of alcohol, [(6)] fell asleep, Doc. 1 at 18, and [(7)] "stole" Petitioner's house, Doc. 1 at 19. Petitioner raised the same contentions in state court habeas proceedings. Lodged Doc. 44. Petitioner's claims were summarily denied. Lodged Doc. 45.

Respondent argues that the California Supreme Court could have denied Petitioner's ineffective assistance claims applying exclusively state law. Specifically, Respondent contends that the lack of evidence submitted in support of Petitioner's ineffective assistance claims was fatal under California law.

Respondent next argues, assuming that Petitioner's submissions were adequate under state law, that Petitioner's allegations do not state a violation of federal law; counsel's performance was not deficient and it did not prejudice Petitioner. The Court will address only this second argument.

### 1. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different....The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (citing Strickland, 466 U.S. at 696, 693).

In the § 2254(d) context, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective

1   assistance of counsel...AEDPA review must be 'doubly deferential' in order to afford 'both the

2   state court and the defense attorney the benefit of the doubt." Woods v. Donald, --- U.S. ----,135

3   S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, --- U.S. ----, 134 S. Ct. 10, 13 (2013)). When

4   this "doubly deferential" review applies, the appropriate inquiry is "whether there is any

5   reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at

6   105.

7       *2. Analysis*

8       The Court will first address Petitioner's first, second, and seventh alleged basis of ineffective

9   assistance —that counsel (1) came late to court, (2) forgot petitioner's name, and (7) stole

10  Petitioner's house. Petitioner does not attempt to demonstrate how any of the above-listed

11  grounds caused him any prejudice.

12      As to Petitioner's first basis for ineffective assistance, assuming counsel did arrive late

13  during trial, there is no indication that the jury was aware that counsel arrived late, much less that

14  the jury was impacted by counsel's alleged late arrival. There is no reasonable likelihood that the

15  outcome of the proceedings would have been different had trial counsel arrived earlier. The state

16  court's rejection of this argument was not contrary to or an unreasonable application of federal

17  law.

18      In similar fashion, Petitioner does not direct the Court to any occasion on the record where

19  counsel forgot Petitioner's name. As a result, the Court is left to conclude that any such failure

20  by trial counsel took place outside of the presence of the jury, thus caused no prejudice. Even if

21  counsel forgot Petitioner's name in the presence of the jury, such a mistake does not create a

22  reasonable probability that Petitioner would not have been convicted of rape. See Blazer v.

23  Scribner, 2009 WL 1740829, *20 (C.D. Cal. June 17, 2009). The state court's rejection of this

24  argument was not contrary to or an unreasonable application of federal law.

25      Petitioner alleges that trial counsel "stole" his house and left town. Trial counsel represented

26  Petitioner through the duration of the trial. Any stealing of petitioner's house and leaving of town

27  by trial counsel must have occurred after the conclusion of the trial. Such conduct could have no

28  impact on the trial. As a result, there is no reasonable likelihood that the proceedings would have

1 been different had counsel not stolen Petitioner's house and left town. The state's rejection of

2 this ground for ineffective assistance was not contrary to or an unreasonable application of

3 federal law.

4     Petitioner's third basis for alleging that counsel was ineffective is that trial counsel promised

5 petitioner that he would not be convicted. Again, Petitioner has failed to show prejudice before

6 the state court and before this Court. The United States Supreme court has confirmed that the

7 Sixth Amendment right to counsel "extends to the plea-bargaining process." Lafler v. Cooper, ---

8 U.S. ----, 132 S.Ct. 1376, 1384 (2012). A §2254 petitioner must show that, but for the misadvice

9 of counsel, that petitioner would have accepted a more favorable guilty plea. Lafler v. Cooper,

10 132 S.ct at 1391. In order to demonstrate prejudice where a defendant claims that trial counsel's

11 defective advice caused him to reject a plea offer and proceed to trial, prejudice is demonstrated

12 where "but for the ineffective advice of counsel there is a reasonable probability that the plea

13 offer would have been presented to the court (i.e., that the defendant would have accepted the

14 plea and the prosecution would not have withdrawn it in light of intervening circumstances), that

15 the court would have accepted its terms, and that the conviction or sentence, or both, under the

16 offer's terms would have been less severe than under the judgment and sentence that is fact were

17 imposed." Lafler, 132 S.Ct. at 1385. Absent from Petitioner's claims has been any suggestion

18 that a plea agreement was offered or that Petitioner would have pled guilty if counsel had

19 accurately advised him of the likelihood of success at trial. As a result, the state's rejection of

20 this ground for ineffective assistance was not contrary to or an unreasonable application of

21 federal law.

22     Fourth, Petitioner alleges that counsel failed to adequately investigate. The Supreme Court

23 has held that "counsel has a duty to make reasonable investigations or to make a reasonable

24 decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.

25 However, there is no requirement that counsel always investigate in every circumstance. See

26 Cullen v. Pinholster, 563 U.S. 170, 195 (2011). Rather, a petitioner must overcome the "strong

27 presumption of competence that Strickland mandates" by providing evidence that counsel's

28 judgment not to conduct further investigation was inadequate. Pinholster, 563 U.S. at 196. In this

1  instance, Petitioner has not attempted to meet that requirement. Petitioner presents no evidence

2  that counsel failed to discovery that would tend to indicate that Petitioner was not guilty.[6]

3  Petitioner has not presented anything that would tend to indicate that the scope of trial counsel's

4  investigation was constitutionally deficient. The state court's rejection of this argument was not

5  contrary to or an unreasonable application of federal law.

6      Next, Petitioner suggests that trial counsel was intoxicated or, at least, smelled of alcohol. As

7  an initial matter, Petitioner has never submitted evidence—other than his own self-serving

8  declaration—to support this contention. Such evidence is insufficient to support an ineffective

9  assistance claim. See Womack v. Del Papa, 497 F.3d 998, 1004 (9th Cir. 2007) (finding

10  petitioner's own self-serving statements insufficient to support IAC claim without corroborating

11  evidence). On that basis, the state court's rejection of this argument was a reasonable application

12  of federal law. Moreover, a showing that counsel was intoxicated, by itself, is inadequate to

13  show ineffective assistance of counsel. See Bonin v. Calderon, 59 F.3d 815, 838 (9th Cir.1995)

14  ("Because we conclude, as the district court did, that [counsel's] performance did not fall below

15  the standard of objective reasonableness, it is irrelevant whether [counsel] used drugs."); Berry v.

16  King, 765 F.2d 451, 454 (5th Cir.1985) ("[U]nder Strickland, the fact that an attorney used drugs

17  is not, in and of itself, relevant to an ineffective assistance claim. The critical inquiry is whether,

18  for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced

19  the defendant."), cert. denied, 476 U.S. 1164, 106 S.Ct. 2290 (1986). Even assuming trial

20  counsel was intoxicated or smelled of alcohol at trial, Petitioner's claim fails because he has

21  directed the Court to no deficient conduct that counsel engaged in or anything that counsel

22  should have done but failed to do because he was intoxicated. The state court's rejection of this

23  argument was not contrary to or an unreasonable application of federal law.

24      Finally, Petitioner alleges that counsel fell asleep at trial. Petitioner did not submit any

25  evidence in support of this assertion to the state court and does not submit any evidence of it

26  here. The absence of any evidence in support of Petitioner's assertion is a reasonable basis for

27

28  [6] Indeed, Petitioner does little more than allege that the investigation conducted was inadequate. He does not explain
what counsel should have found or why counsel's investigation rises to the level of unprofessional conduct.

23

rejection of his argument.  See Womack, 497 F.3d at 1004. Assuming that trial counsel did fall

asleep at some time during the trial, such conduct does not result in per se prejudice to Petitioner.

No Supreme Court authority clearly establishes that sleeping at trial is per se ineffective

assistance. Under Ninth Circuit precedent, only if an attorney for a criminal defendant "sleeps

through a substantial portion of the trial" is such conduct per se prejudicial. Javor v. United

States, 724 F.2d 831, 833 (9th Cir. 1984) (citing Holloway v. Arkansas, 435 U.S. 475, 489-91

(1978)). Where counsel was not "sleeping or dozing during a substantial portion [of the trial],

and may not have been sleeping at all," the petitioner has the burden of showing prejudice.

United States v. Peterson, 777 F.2d 482, 484 (9th Cir. 1985). Petitioner did not submit any

evidence to the state court to suggest that counsel was sleeping of for a substantial portion of the

trial or that he was sleeping at all. Petitioner also failed to submit to the state court any evidence

tending to suggest that counsel's sleeping during trial, if it took place, caused him any prejudice.

For those reasons, the state court's rejection of this argument was not contrary to or an

unreasonable application of federal law.

## V.   CONCLUSION

Petitioner is not entitled to relief with regard to the claims presented in the instant petition.

Therefore, the petition will be denied.

## VI.   CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

district court's denial of his petition, and an appeal is only allowed in certain circumstances.

Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
> district judge, the final order shall be subject to review, on appeal, by the court of
> appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the
> validity of a warrant to remove to another district or place for commitment or
> trial a person charged with a criminal offense against the United States, or to test
> the validity of such person's detention pending removal proceedings.

(c)      (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

///

///

///

## VII.   ORDER

Accordingly, IT IS HEREBY ORDERED:

    1)   The petition for writ of habeas corpus is DENIED;

    2)   The Clerk of Court is DIRECTED to enter judgment and close the case; and

    3)   The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   July 26, 2016

_____

SENIOR  DISTRICT  JUDGE